IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

WESTERN DISTRICT, SEPTEMBER TERM 1840.

## Dunlop *against* Dunlop.

It is essential to the validity of a will, that it be signed by the testator, or by some person in his presence, and by his express direction, unless the person making the same shall be prevented by the extremity of his last sickness; and if it be otherwise signed, no subsequent ratification of it by the testator will give it validity.

WRIT of error to the district court of *Allegheny* county.

John Dunlop and others against James Dunlop. This was an action of ejectment for a lot of ground, which involved the validity of a paper purporting to be the last will and testament of James Dunlop, Sen., deceased. The only question was, whether the will was legally executed, in pursuance of the provisions of the act of the 8th April 1833. The defendant claimed as a devisee under the will.

The undisputed facts of the case were in substance as follows:— The testator requested one of the witnesses, Samuel Milliken, to draw his will for him, and told him how he wished to dispose of his property, in the presence of another witness. Milliken took a written memorandum from the mouth of the testator, of what he wanted in his will, and took it away, and drew a more formal testamentary instrument, in substance the same as his rough draft.

X.—O

[Dunlop v. Dunlop.]

The next day he returned to the house of the testator, with two witnesses for the purpose of having the same executed, but found the testator speechless and senseless. Supposing that it was absolutely necessary that the will should be signed, whether the testator was able or not, and that he was about to die, they proceeded to hold him up in his bed, while one of the persons present (having previously written the testator's name to the will) put a pen in his hand and directed it while making a mark. The will was not read to the testator, because they supposed it useless, as he could not understand anything at that time. But the testator revived and got better, and on the following day sent for Milliken to come and read his will to him; Milliken went accompanied by one of the witnesses who had been there the day before. At the testator's request the will was opened (for it had been sealed up) and read to him distinctly, concluding with the formal attestation " signed, sealed, published, and declared by me, the above-named James Dunlop, to be his last will and testament," &c. The testator said, " it was just as he wanted it." This was proved by two witnesses, who fully concurred in all their statements.

The court below instructed the jury, " that if they believed from the evidence that the testator knew his name had been put to the will, and by his declaration intended to ratify and confirm that act, it may be considered as his act, and will bring the case within the statute."

Upon a motion for a new trial, the court below, (Grier, president) expressed great doubt about the correctness of his opinion as delivered to the jury; but refused the motion, and recommended that his opinion should be reviewed by this court.

*M'Candless*, for plaintiff in error, cited 1 *Doug.* 241; *Skin.* 227; 3 *Lev.* 1; 1 *Maule & Sel.* 295; 2 *Showers* 297; 2 *Vez.* 458; 5 *Whart.* 386.

*Shaler*, for defendant in error, cited 1 *Roberts on Wills* 93, sect. 11; 2 *Bos. & Pul.* 217; 3 *Pr. Wms.* 254; 1 *Vez. Jun.* 11; 1 *Vez. & Beames* 362; 8 *Vez.* 504; 19 *Com. Law Rep.* 91.

The opinion of the court was delivered by

GIBSON, C. J.—The framers of the statute intended, not only to require every will to be signed where signing should be practicable, but to exclude entirely the doctrine of signing by construction. Warned of the difficulty of excluding interpretation by the judicial evasions of the fifth and sixth sections of the British statute of frauds which had been effectively repealed by decision, they have attempted, and I think with success, to lay down a rule so definite and plain, as not to be eluded without a palpable infraction of its terms. Yet the obviousness of a rule is not always enough to make it respected. Mr Roberts justly remarks in his treatise on Wills, (*vol.* 1, *chap.* 1,

§ 11,) that had the language of the English statute been under-stood in its usual sense, there would have been no contention about its meaning; but that the courts, yielding to the popular bent in favour of the freedom of alienation, had broken through the statu-tory guards and, instead of executing the mandate of the legislature, had frustrated it.　Let us be admonished by the disputation and uncertainty which ensued, not to follow their example.　In Ellis *v.* Smith, 1 *Vez. Jun.* 11, in which the acknowledgment of a will before three witnesses, was ruled to be equivalent to signing it in their presence, Lord Hardwicke and the eminent men called by him to his assistance, agreed with one voice, that had not the matter been *res indicata*, it would have received a different decision; and that, by dispensing with some of the solemnities prescribed by that statute, much had been lost.　Decisions upon it, however, are not enough to fasten upon us the errors of a foreign interpretation, or to prevent us, at the outset, from giving such a direction to the current of decision on our own statute, as will entirely consist with the intention of the legislature.　Were we to insist on no more than signing at the end of a will, instead of the beginning of it, the purity of testamentary acts would be even less secure under it, than under the British statute of frauds which, in addition to signing, exacts attestation and subscription by witnesses in the testator's presence. In Stricker *v.* Groves, 1 *Whart.* 395, our interpretation was in accordance with the obvious meaning of the words; and it is our duty to carry it, on the same principle, into every subsequent case.

In the words of the statute, then, was the paper before us signed by the *decedent,* or by any person *in his presence* and with his *express direction,* or if not, was he prevented from signing it by the extremity of his last sickness?　The facts are not contested.　He instructed his friend Milliken to write his will, but when it was brought to him to be executed, he-had sunk into a deathlike stupor and temporary unconsciousness.　His eyes were open, but their sense was shut.　At least Milliken and the rest thought so, as the will was neither read nor attempted to be explained to him.　In this condition, his name was written by Milliken at the bed side; he was then held erect while a pen was put into his hand, which was guided by Milliken, so as to make the usual cross in the signa-ture of a marksman; and Wells and Philpot subscribed as witnesses. Milliken subscribed a few days afterwards.

So far forth, there was clearly no valid execution.　Had the decedent died at this time, the original draught might have been established without the mockery of his signature, extorted when he could neither assent nor dissent.　But certainly no will was then signed by him, or by any one in his presence and with his express direction; for there was no magic in his touch to make the signature his act.　The hand employed to affix it, might as well have belonged to a lifeless trunk.　Both its power and the intelligence necessary to rouse and direct it, were in a state of suspension; the man was,

in fact, a breathing corpse. It is not pretended that the name was affixed by his express direction, for he was incapable of expressing a wish or desire, had he entertained any; and, in- this important particular, the case is in strong contrast with Stevens *v.* Vanclive, 4 *Wash.* 262, in which the testator's hand had been guided at his explicit request. Indeed the only ground on which the signature was attempted to be impugned in that case, was an apparent want of authority by the statute of New Jersey on which the question of execution turned, for affixing the testator's name by any hand except his own; but the execution was held good, Mr Justice Washington remarking that, in whatever aspect it might be viewed, the signature must be taken to be the testator's—a conclusion entirely consistent with the common law principle, that whatever is done in a man's presence and by his immediate command, though without a sealed authority, is his immediate act. The guiding of the hand, in such a case, is no more a part of the solemnity, than would be the placing of the, paper or the holding of a candle. But that case differs from ours in the all-important particulars of capacity and request; and as it can not, by reason of their absence, be said that the decedent signed at the time his name was written, it remains to determine the effect of his subsequent ratification of the instrument when consciousness and speech had returned to him.

His partial recovery is decisive that he was not prevented from signing by the extremity of his last sickness; for he certainly regained the power, whatever may be said of his volition, to fulfil the requisition of the statute by signing himself, or procuring another to sign for him. Yet he did neither. The will being called for and read to him, he merely said it was just as he wanted it; and the question of execution consequently rests on the antecedent transaction strengthened, as far as it may be, by subsequent ratification of it. I assume, as a thing demonstrated, that the paper, when it was read to him, had not been signed by him or any one in his presence, and by his direction within the purview of the statute; for though corporeally present, he had been mentally absent, and the case stands no better for the defendant, in that respect, than if the paper had been brought to him without the semblance of a signature. But suppose a will to be brought to a man with his name put to it by another hand—would his adoption of it be a compliance with the statute? Certainly not, whatever may be the effect of ratification by the common law; for the signing must be done, not only by his direction, but in his presence, and consequently at the time of its adoption. To what time is it referable by the statute? Necessarily to the time of ratification when it can, for the first time, be said, by the most favourable construction, to be the decedent's act. But at that time, the name was not affixed either in his presence or in his absence: it had been written before, when it contributed no more to the act of execution, than if it had not been written at all. Here then was one cardinal direction of the statute disregarded.

[Dunlop v. Dunlop.]

Again—it was not written by his direction, for it was written before he had power to direct. But it is said, that as every ratification is equivalent to a precedent authority, the antecedent signing became, by adoption, his immediate act. Such a position would not be assumed even under the statute of frauds. "It has been hinted," said Lord Hardwicke in Ellis *v.* Smith, already quoted, "as if this determination would lead the way to farther deviations from the statute; and by consequence allow the testator's *declaration*, that another signed for him to be good: but authority given by a statute is a collateral thing, and a thing that ought to be proved; consequence is not to be built on consequence in a case of this nature. I think that where things are expressly required by statute, courts are not to say, other things shall be equivalent to them." Was it not to exclude that very inference, which had given so much trouble under the statute of frauds, and to declare that the exigencies of the rule should not be satisfied with equivalents, that our statute was enacted? It was obviously to exclude interpretation that the signature was directed to be placed at the end, and if a constructive signing was intended to be precluded in that particular, it was intended to be precluded in every other. Besides, ratification is an equivalent for authority only by implication; and the direction contemplated in the statute is peremptorily required to be express. Moreover, the statute speaks not of authority, but direction, which being antecedent to the intended act, must be express when it has any place at all, for though the difference is a slight one, it is certain that while every direction is an authority, every authority is not necessarily a direction. But ratification, being merely an act of adoption, is not even an authority, but only an equivalent for one which, I have said, answers not the exigence of the statute. Can it be supposed that the legislature, in laying down a plain rule for the unlettered and unassisted, intended it for matters which could be brought within it only by deduction? Such an interpretation would let in the very mischief intended to be excluded. We are therefore unable to concur in the opinion of the district court, expressed, as the president frankly admits, with hesitation.

Judgment reversed and a *venire de novo* awarded.