# Cavett's Appeal.

It is essential to the probate of a will, to which the alleged testator did not sign his name but made his mark, that it should be proved by two witnesses that he was so infirm as to be unable to write his name: it is not sufficient that it should have been testified by one witness that he was unable to write, and by the two subscribing witnesses that he acknowledged the instrument to be his last will and testament after he had put his mark to it.

APPEAL from the decree of the Register's Court of *Westmoreland* county admitting to probate and granting letters testamentary upon a paper purporting to be the last will and testament of Robert McKean deceased. The will and the name Robert McKean signed to it were written by Benjamin Byerly, and the alleged testator made his mark at the name. Upon a hearing of the case before the Register's Court, Adam Ludwick and Benjamin Miller, who were the subscribing witnesses to the paper, testified as follows:

Adam Ludwick sworn.—This is my handwriting (the will was here exhibited to the witness). I did not see Mr McKean sign this will. When I went there Mr McKean was sitting in his armchair, near the table where the will was on; he told me he had been making some alterations in his will, and told me to sign it as a witness; before I signed it Benjamin Byerly asked him if he acknowledged that to be his last will and testament; he said yes,

and requested me the second time to sign it; I signed it, and this is my name to that paper. His mark was to it when I signed it; that is the paper, it was as it is now, this paper was before him; I saw nothing the matter with his mind at the time I signed the will; I believe he was of sound mind at the time; he told Mr Byerly in my presence to destroy the former will.

Cross-examined.—I did not then retire, but stayed until after the other witness had signed it; he was not in at the time I signed it. The alleged testator did not take the paper in his hand. I do not recollect whether there were other papers on the table at the time; there might have been, part of the will was covered over. The paper remained in the same situation as when I came in; it lay on the table. The deceased was not more than 3 or 4 feet from the table; I cannot tell who wrote the will, I did not see it wrote. I did not see the old will. When Mr Miller came in I heard the old man say he had made some alterations, but whether he said *will*, I cannot say. Thomas McKean, a brother of deceased, requested me to come there that day; this paper was not read to him while I was there. I saw no writing except a few lines of the will itself, at the bottom of it.

Benjamin Miller sworn.—(Will exhibited)—This is my name; Mr Black came up for me; I went down with him; went into the room where the testator was, and bid him the time of day. He told me he was better than he had been, he had been unwell a day and a night before, and that he was much better. When I went in he said, "I took a notion to alter my will, and I have to bother my neighbours again;" the next was, we began talking about other matter, his health, &c. Mr Byerly said the will was ready for signing; I got up then, and asked the old man if it was his wish that these alterations were making, or made, he said it was; I then thought he would say something more. I paused; there was nothing said; then I went and signed it. Before that Mr Byerly said the evening was drawing to a close, and then I went and signed it. Mr McKean was probably six feet from the will when I signed it; Adam Ludwick's name was to the paper when I signed it. Any person could have seen the paper from Mr McKean's position; I can't say whether he saw it or not; there was no person betwixt me and him. I think there were other papers under it, one covered over it in part. Mr Byerly was a little bit from the table at the time he said the will was ready for signing. After I had signed it I had no consideration about the will; I had seen no change in the man at the time; I think he was of sound mind at the time. Mr McKean died in November 1841. He was blind of one eye; he told me himself he had lost one eye; he wore two pair of spectacles when he was reading—but whether his eyes were weak I cannot tell; this was before the date of the will he told me this; I am not able to say positively whether he had these spectacles on when I went into the room; it runs in my

mind he had: I did not hear the will read to him; I did not hear him tell anybody to sign his name to the paper, or make his mark; the mark was on the paper when I first saw it, and his name written; I did not see any writing on the other papers that were on the table; Mr McKean was sitting with his side towards the table—there were a few lines at the lower end of the paper that were not covered.

Rev. Alexander M'Candless sworn.—I called frequently with Mr McKean between May and November 1841. I heard Mr McKean say he intended to leave very considerable to the Foreign Missionary board; it is all I heard him say on that subject; I heard him repeat it.

Dr Benjamin R. Marchand sworn.—Some two or three years before Mr McKean's death he complained to me of his eye-sight becoming defective; I examined his eyes and found him blind in one eye from the catoræl; I had then some apprehension from the appearance of the other eye; but from that time till the time of his death, I heard no complaint about his eye-sight from him—he was always able to recognize me by sight when I visited him; he was hard of hearing; he required from me a loud and distinct tone of voice to be understood; persons whose voices he was familiar with he could hear with less exertion.

Cross-examined.—I was called on very frequently to visit him in relation to the complicated diseases with which he was afflicted; in the subsequent visits he never asked me to examine his eye-sight; I heard no complaint from him afterwards in regard to his eyes; I presume he could recognize any person at the distance of 8 or 10 feet, or half the distance of the room; generally when I visited him the room was dark, by the blinds being down; after being in the room a while, I could see distinctly; I don't know the reason why the room was kept dark; on some occasions I had to repeat very loud to make him understand me; his niece Agnes George, could get him to understand by speaking to him in a lower tone of voice.

Miss Agnes George sworn.—He was blind of one eye, and the other was very dim; it had been the case for a couple of years; he received a letter about two years before he died, and tried to read it to me, but could not do it; about the time, or before he made his will, the doctor had sent him directions with medicine, and I wished him to read it, he said he could not see; I said I would fetch him his spectacles, he said he could not see; he was so deaf that I could hardly get him to understand towards the last; his hearing at the time he made his will was as usual; sometimes he was worse than at others; when he would get cold.

Cross-examined.—I would not say whether the letter was well or badly written; I believe the blinds were down when the instructions came from the doctor; I have seen him with a book in his hand before and after he received the letter.

[Cavett's Appeal.]

The cause coming up upon this evidence, the Supreme Court appointed a commissioner to take further testimony upon the subject, who made a return of the following evidence:

Charles Harkless sworn.—I was acquainted with Robert McKean for fifteen years before he died; he could write. When I first knew him he wrote a plain hand; the last time I saw him writing anybody could read it; it was a will; saw him write his name to three wills. Can't exactly recollect the time; about six years ago; perhaps not so long ago as six years, since I saw him sign the last will. He was always a sensible man when I knew him. In his last sickness I thought he was not right at himself; he asked me why I had been so long away, that I had not been there for six months, although I had been to see him the week before. Mr McKean was near seventy years of age when he died. I expect he had suffered a good deal of sickness from the time I saw him sign the will until the time he died. He was about a year sick, as near as I can recollect, before he died. The first will I saw him sign he was in pretty good health; when I saw him sign the last he was weak and delicate. For two years after I saw him sign the last will that he signed in my presence he was healthy; for a year before he died he was sickly.

Benjamin Byerly sworn.—William Black came for me to write the will of Robert McKean. When I came to his house, Robert McKean stated to me that he wanted to make some alterations in his will. I did write it as he directed me. When he came to sign, he had been very unwell before, but had got better; he stated that he could not write his name, that his hand shook or trembled on account of his late sickness; he asked me if it would make any difference if he would sign it then (he was then at the table looking at the will) before the witnesses came in? I told him I thought not, if he would acknowledge it when the witnesses came in, acknowledge it to be his last will and testament. He then made his mark to it in my presence. I thought he could see unusually well that day; he recognized Robert Cavett forty or fifty yards off; he was looking at him through the window. I was present when the witnesses to the will came in; I understood him to acknowledge it in their presence and to ask them to sign it as witnesses; I did not pay particular attention to what was going on, not to all the conversation. He requested me to take the will home with me. I had a former will in my possession, which he directed me to destroy: I burnt the former will as directed; it was signed by himself.

*Coulter*, for appellant, cited 10 *Watts* 153; 5 *Whart.* 356; 6 *Serg. & Rawle* 489.

*Foster*, for appellee, cited 1 *Watts & Serg.* 396.

[Cavett's Appeal.]

The opinion of the Court was delivered by

GIBSON, C. J.—In the remarks which the commissioners to revise the civil code have appended to their second report, they say that where the party is unable to affix his proper signature to his will, by reason of infirmity or otherwise, it is provided in the statute, reported by them as it has been enacted, that it may be done by another person in his presence and by his express direction. It must be admitted that the statute makes no such provision in express terms; it requires that "every will shall be in writing, and, unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence, and by his express direction." It will be perceived that if he be not thus prevented, he is left at liberty by the letter to sign it with his own hand or by the hand of another; the one being a substitute and an equivalent for the other at his election. That inability to sign with his own hand is not an *express* condition precedent to signing by the hand of another, is conclusively shown by transposing the clauses of the sentence, Every will shall be signed by the person making it, or by some person directed to do so in his presence, unless he be prevented by the extremity of his last sickness—from doing what? Affixing his proper signature or procuring some one to do it for him; and what ensues the happening of the contingency? Not a license to employ another, for it is a postulate and a branch of the contingency itself, that he is unable to do so; but the case is left to stand, as the commissioners very properly say, on the provisions of the Act of 1705; a conclusion not to be avoided but regretted, as nothing could be more distressing than the uncertainty in which the subject was involved by that statute. But it is very clear that they spoke not unadvisedly of the legal effect of the section before us in every aspect of it, when liberally interpreted, as every remedial statute ought to be; and the fact that they had not explicitly declared their whole intention in it, is one proof among a thousand of the inaptitude of language to express all the operations of the mind, even when used by the most skilful; and of the imperfect adaptation of legislative provisions to particular cases. Little would have been done to prevent forgery and fraud, had signing by an amanuensis been allowed to convenience or caprice, instead of necessity. In a question of forgery, the character of the handwriting must ever be a circumstance of the first importance; and it surely was not intended to dispense with it where it could be had. It might be impaired by tremor or infirmity; but even if it were destroyed, the uncertainty arising from it would be no greater than if the name had been written by the hand of another. The handwriting of the party himself, is certainly better evidence of authenticity than that of any one else; and it is not a supposable case that the legislature meant to subvert a wholesome principle of the law of evidence.

VIII.—4                    C

[Cavett's Appeal.]

Then do the proofs before us show that the alleged testator was so infirm as to be unable to write his name? The subscribing witnesses testify that when they were called in, he was sitting near the table on which lay the paper with his name and mark to it; and that they subscribed their names to it in his presence and at his request. This is the substance of their testimony. His physician testified that his sight was dim, though he could readily distinguish his acquaintances; and his housekeeper testified that he had been unable to read a letter or the directions of his physician, though she had seen him reading books. Thus stood the evidence at the first argument, and it certainly falls short of proof of entire disability. The additional fact brought out by the evidence since taken by our direction, shows that defect of vision was not the difficulty. The scrivener testified that he could see unusually well at the time of signing, but complained that " he could not write his name; that his hand trembled or shook on account of his last sickness." The other witnesses say nothing about tremor, and it would be a measuring case, did the question of disability stand on common law evidence before a jury, instead of the evidence prescribed by a statute which requires the testimony of two witnesses to every part of the case. Here it stands on the credibility of the scrivener alone; and in that respect the proof is deficient. It is deficient also in the evidence necessary to show that the decedent's name was signed to the paper in his presence and by his express direction; and though that fact might possibly be inferred from the testimony of the scrivener, it rests also on the testimony of only one witness. But inferential proof of direction seems to be inadmissible, as the statute requires the direction to be express, and consequently to be affirmatively proved. Every part of the case must be distinctly made out *to satisfy the jealous provisions of a statute which requires every* fact that happens to be a link in the chain of evidence, to be doubly proved. The subscribing witnesses prove the decedent's subsequent acknowledgment of the paper as his will; but not that his name had been put to it in his presence and by his express direction; for which, according to *Dunlop* v. *Dunlop* (10 *Watts* 153), subsequent acknowledgment or adoption, is not an equivalent. In these respects, the proof falls decisively short of the sum required by the statute.

Decree reversed, and letters testamentary revoked.